RUDOLPH SIEBER v. GREAT NORTHERN RAILWAY COMPANY.

May 17, 1899.

Nos. 11,563—(99).

**Death by Wrongful Act—"Bucking" Snow.**

Action to recover damages for the death of plaintiff's intestate, caused by the negligence of the engineer of defendant's train, on which deceased was fireman, in "bucking" snow. *Held* that, upon the evidence, the question whether the deceased had assumed all the risks incident to "bucking" snow in the manner and under the circumstances existing on this particular occasion was for the jury.

**Same—Expert Evidence.**

Also, that the questions whether the method adopted by the engineer was a proper and prudent one, and what would have been the proper and prudent course, under the circumstances, were subjects for expert evidence, not being matters of common knowledge.

**Verdict—General Damages.**

Also that, upon the established facts, a verdict for $2,500 as the gen-

eral damages of the next of kin (the father) by reason of the death of the deceased was neither excessive nor unsupported by the evidence.

## Same—Expenses of Last Sickness.

But that the amount ($500) awarded for care of the deceased during his last sickness and for funeral expenses was in excess of what the evidence justified.

Action in the district court for Clay county by plaintiff as administrator of the estate of Mathias H. Sieber, deceased, to recover $5,000 damages resulting from decedent's death. The case was tried before Baxter, J., and a jury, which rendered a verdict in favor of plaintiff for $3,000. From an order denying a motion for judgment notwithstanding the verdict, or for a new trial, defendant appealed. Affirmed on condition.

*C. Wellington,* for appellant.

*Chas. S. Marden* and *M. R. Tyler,* for respondent.

MITCHELL, J.

Plaintiff's intestate had been in the employment of the defendant as locomotive fireman for over three years. During the last five or six months of that time he had been regularly employed in that capacity on the train running between Moorhead and Crookston. This is a mixed train, which runs north one day and back the next, except that it is not operated on Sunday. On the morning of Monday, February 1, 1897, this train started on its trip north, and consisted of an engine, tender, nine box cars, and three coaches, including a baggage car. It had a pilot attached to the engine, but no snowplow. About ten o'clock in the forenoon a snowdrift was encountered, which the engineer attempted to "buck," with the result that the engine was derailed and upset, and the deceased thereby sustained injuries of which he died on the second of the following March.

The gist of plaintiff's cause of action is the alleged negligence of the engineer in attempting to "buck" the snow in the manner and under the circumstances in which he did on this occasion. While counsel perhaps suggest that there was no evidence tending to prove negligence on part of the defendant, their main contention is that the evidence conclusively shows that the deceased had vol-

untarily assumed the risks which caused his death. Irrespective of this question of the assumption of risks, we are clear that the evidence made a case for the jury. The assumption of risks, like contributory negligence, is defensive matter, and the burden of proving it was upon the defendant.

The evidence is that generally that winter the track was covered with snow, and that the men operating this train had been in the habit of meeting drifts quite frequently. Indeed, in view of the general character of that winter, of which we may take judicial notice, this would presumably be so. It appears that there had not been a snowplow over the road up to the time of the accident. In view of all the evidence, we think it conclusively appears that it had been the custom all that winter, up to the date of the accident, to "buck" whatever snowdrifts this train met, with a pilot attached to the engine, as was done on the day of the accident. It must also be accepted as true that the deceased had assumed all the risks incident to bucking snow in the manner in which and to the extent to which it had been accustomed to be done by that train during the previous part of that winter.

But plaintiff's contention is that, even when tested by this previous custom, the risks of which the deceased had assumed, the conduct of the engineer on this occasion was negligent and extra hazardous, in view of the length, depth, and hardness of this particular drift, and in view of the particular manner in which he attempted to "buck" it; and these risks the deceased had not assumed.

The evidence is that, no train having been over the road on Sunday, and the weather being cold and windy, considerable snow had drifted on the track on Sunday and Sunday night; that this particular drift was from 50 to 300 feet long (as variously estimated by different witnesses); that it was from 2 to $2\frac{1}{2}$ feet deep in the center, but decreased in depth towards the ends; that the snow was very hard and solid,—sufficiently so to permit men to walk on the surface. The testimony of the engineer is that he saw the drift when he was about a mile off; that when he got within two trains' length of it he thought it was safe to go through it, and signaled the brakemen that he was going ahead, and not to stop him; that he then went ahead at the rate of 18 to 20 miles an hour, plowed into the

drift, and that the engine went off the track where the drift was a foot or 18 inches deep. It is evident that the wheels of the engine "lifted" owing to the depth and hardness of the snow. All the evidence bearing upon the question of the comparative character of this drift and others which had been "bucked" that winter, and of the particular manner in which they were "bucked," other than that already stated, was the testimony of the engineer, which was as follows:

"Q. What was the condition of the track as you went north from Moorhead [on the day of the accident], as far as snow was concerned? A. There was more or less snow at different points. Q. I will ask you whether or not that had been the usual condition of the track during the time [two months] you had been running when Sieber was your fireman. A. Yes, sir. Q. What, if anything, was there different in the track that morning from what it had been during the two months you had been running? A. Well, I don't know as there was anything in particular. Of course, I would find the track different on different days. Q. Was there anything particularly different in the track that morning from what it had been prior to that morning? A. No, sir; not in appearance, anyway. * * * Q. Do you recollect about the point where your engine was derailed? A. Yes, sir. Q. I will ask you if, prior to the time your engine was derailed, you had run through any drift of snow. A. Yes, sir. Q. How many? A. I could not say how many. There was many of them of different sizes. Q. Had you had any difficulty or not in going through those drifts? A. I think we got stuck in the snow, failed to go through. Q. Outside of that, what did you mean? A. We met enough snow to check our speed considerable at different points. Q. Do you recollect this drift where your engine was derailed? A. I do. Q. Did you look at the drift before you went into it? A. Yes, sir. Q. What was there in the appearance of that drift different from other drifts that you run through that morning? A. Nothing in particular. Q. State whether you saw anything in that drift to warn you of there being any danger. A. Not any more than other drifts I have been through."

He also stated that it was not what would be called a large drift for that winter. On cross-examination, when asked if it was not dangerous to run such a train through such a drift, the witness replied that absolute safety is not known on a railroad; that it was certainly dangerous to some extent; that he knew there was a certain amount of danger connected with it; that there was a

possibility, but not a probability, of the train being derailed. Plaintiff called two witnesses as experts, one of whom was asked the following question, and gave the following answer:

"Q. I will ask you, as a railroad man and an expert, whether it was proper to run that engine, * * * without any snowplow or any other appliances than what you did find on it [a pilot], into a drift like that, * * * without examining it. A. No it was not."

The other was asked and answered the following questions:

"Q. What was the proper and prudent course for an engineer on that kind of a train with that kind of an engine, to take on approaching that kind of a drift? A. Well, we received a personal letter during the winter to be careful, or we would have to assume the risk; to be careful,—which would be to stop and examine,—or assume the risk. Q. On approaching a drift [of that kind with that kind of a train], what would be the proper and prudent course for an engineer to take? A. To stop and examine the drift, and, if you didn't think it was possible to take the train through, to take the engine off, and take the engine through first, and then back up and take the train through, if we saw it [the drift] quick enough to stop."

Defendant objected to the competency of this evidence (not to the competency of the witnesses) as not being the subject of expert testimony, but a conclusion for the jury to draw from the facts. We are of opinion that the matters inquired about were proper subjects of expert testimony, not being matters of common knowledge.. The mere fact that the opinion called for may cover the very issue which the jury is to pass on is not conclusive that it is not the subject of expert or opinion testimony. Donnelly v. St. Paul City Ry. Co., 70 Minn. 278, 73 N. W. 157. We see nothing improper, under the circumstances, in the questions to the experts.

We have stated all the evidence bearing upon the deceased's assumption of the risk, and our conclusion is that it left the question one for the jury, keeping in mind that the burden of proof was on the defendant. When a railroad employee engages in work involving "bucking" snow he assumes all the risks (at best, quite great) which are naturally and ordinarily incident to that kind of work; and it is also true that if his employer is accustomed to

76 M.—18

"buck" snow in a certain manner, or with certain appliances, and he continues in the employment without objection, he assumes all the risks incident to doing the work in that manner, although the manner may be a negligent one, and the appliances inadequate and unsafe. But it by no means follows that, because an employee has assumed the risks of "bucking snow," he has thereby assumed the risks of every attempt to do so in any and every manner, regardless of circumstances. All the risks the deceased can be held to have assumed are those incident to bucking such drifts as this train had been accustomed to buck, and in the manner in common use. For example, if it had been the custom of the engineer to buck small drifts of a few inches in depth, which might be done in comparative safety, it cannot be held from this that, as a matter of law, the deceased had assumed the risks incident to bucking, without examination, a drift of hard-packed snow two feet deep.

In view of the somewhat general, vague, and seemingly almost evasive character of the evidence, it cannot be held that it conclusively appears that the deceased had voluntarily assumed risks of the kind and degree involved in attempting to buck the drift in question on the morning of the accident. The question was, on the evidence, one for the jury.

2. The jury awarded the plaintiff $3,000, and in a special finding stated that $500 of this amount was allowed for expenses of funeral and last sickness. Defendant's contention is that this verdict was excessive, and not sustained by the evidence.

The evidence is that the deceased was unmarried, leaving neither widow nor issue; that his father was 60 years old; that the deceased was 28 years old, earning $60 or $70 per month, in "number one" health, nearly 6 feet in height, and weighing 175 or 180 pounds, of goods habits, sober, and worked regularly. It further appeared that he had been away from home three years, working for himself, as a locomotive fireman; two and a half years of that time as an extra man when needed, but having regular employment the last five or six months. There was no evidence that he had ever helped his father, or his family, after he attained his majority, except that he had taken out and carried $3,500 life insurance for the benefit of his mother, which she received after his death. He left no money,

and there was no evidence that he had accumulated any property. Neither was there any evidence as to the financial circumstances of his father.

It is contended that this evidence did not justify the award of $2,500, or of any substantial damages; that it did not justify the conclusion that the next of kin would have ever received any pecuniary benefit from the continuance of the life of the deceased, at least to the amount awarded. This contention is mainly predicated upon the fact that it was not made to appear that the deceased had accumulated any property, or given any pecuniary aid to his father after he attained his majority. If these facts, or either of them, had been made to appear affirmatively, they would probably have materially aided the jury in determining what pecuniary benefit the next of kin might have derived in the future from the continuance of the life of the deceased, and, consequently, what they lost by his death; but it was not essential to the recovery of substantial damages that either of these particular facts should have been affirmatively proved. There are numerous other facts from which the jury would be justified in finding that the next of kin had sustained substantial loss by the death of a deceased relative, and numerous cases can be found where the award of substantial damages has been sustained where neither of the facts referred to had been proven. If defendant's contention should be sustained, it would follow that substantial damages could never be recovered when the deceased was a young man, who had just attained his majority, and hence had not had time to accumulate money or property, or where, up to the time of the death of the deceased, his next of kin had not needed any pecuniary aid.

The true and only test in cases of this kind is, what sum will compensate the next of kin for the pecuniary loss sustained by them by the death of the deceased; or, in other words, what, in view of all the facts in evidence, was the probable pecuniary interest of the beneficiaries in the continuance of the life of the deceased? It is undoubtedly true that the reasonable character of the expectation of pecuniary benefit from the continued life of the deceased and of the probable amount of that benefit must appear from the facts in proof. But at best the amount of damages must

be largely a matter of conjecture. There is no precise rule which a court can lay down or which a jury can adopt in estimating such damages. It is a question that must be left to the judgment of the jury upon the whole case, and, when fairly submitted to them, and the damages are not excessive, their verdict will not be disturbed. In the present case the relation between the next of kin and the deceased was that of father and son, the latter being under legal obligation to support the former in case of necessity for such support. The ages of both were proven, thus furnishing a basis for determining the expectation of life of each. The son was a young man, in perfect and vigorous health, of sober and industrious habits, earning from $60 to $70 per month, and who had already evinced sufficient filial regard for his parents to carry a considerable life insurance for the benefit of his mother.

In view of all these facts, we cannot say that a verdict of $2,500 was excessive, or unsupported by the evidence.

3. The total sum which the father had paid, or for which he had become liable, for the expenses of the last sickness or the funeral of the deceased, was $379, and there was no evidence to support a verdict for any larger sum. It does appear that the father and mother performed services in attending the deceased during his illness; also that they furnished board for nurses furnished by other parties; but there was no evidence as to the reasonable value of either these services, or of the board furnished. For this reason any award for expenses of this last sickness and of the funeral in excess of $379 is not supported by the evidence.

It is therefore ordered that a new trial be granted, unless the plaintiff shall, within twenty days after the filing of this opinion, consent in writing (to be filed in the district court) to remit $121 from the amount of the verdict, in which case the order appealed from shall stand as affirmed, and the plaintiff shall be entitled to judgment for the amount of the verdict as thus reduced. It is so ordered.